No. 2023-1302

# United States Court of Appeals for the Federal Circuit

———————————

EPIC SYSTEMS CORPORATION,

*Plaintiff-Appellee,*

*v.*

DECAPOLIS SYSTEMS LLC,

*Defendant-Appellant.*

*Appeal from the United States District Court
for the Southern District of Florida in Case No. 9:22-cv-80173,
Judge Donald M. Middlebrooks*

## RESPONSE BRIEF OF APPELLEE EPIC SYSTEMS CORPORATION

Kristin Graham Noel
kristin.noel@quarles.com
Matthew J. Duchemin
matthew.duchemin@quarles.com
Bryce A. Loken
bryce.loken@quarles.com
QUARLES & BRADY LLP
33 East Main St., Suite 900
Madison, Wisconsin 53703
Tel. (608) 251-5000
Fax (608) 251-9166

*Counsel for Plaintiff-Appellee, Epic
Systems Corporation*

MAY 8, 2023

# EXEMPLARY PATENT CLAIMS AT ISSUE

## Claim 2 of U.S. Patent No. 7,490,048:

2. A computer-implemented method, comprising:

processing, with a processor, a request by a person or an entity to at least one of access, obtain, change, alter, and modify, information contained in an individual's or patient's healthcare record or an individual's or patient's healthcare file of the individual or patient wherein the individual's or patient's healthcare record or the individual's or patient's healthcare file of the individual or patient contains healthcare information or healthcare-related information personal to the individual or patient;

generating a message containing at least one of information regarding the person or the entity making the request and identification information regarding the person or the entity making the request, and further wherein the message contains an actual change, alteration, or modification, sought to be made or made to the information contained in an individual's or patient's healthcare record or an individual's or patient's healthcare file; and

transmitting the message to a communication device of the individual or patient via, on, or over, a communication network, wherein the message is transmitted to the communication device of the individual or patient at least one of during, concurrently with, at a same time as, and prior to a completion of, at least one of an accessing, an obtaining, a changing, an altering, and a modifying, of the information contained in an individual's or patient's healthcare record or an individual's or patient's healthcare file by the person or the entity, or at least one of during, concurrently with, at a same time as, and prior to a completion of, a processing of the request to at least one of access, obtain, change, alter, and modify, the information contained in an individual's or patient's healthcare record or an individual's or patient's healthcare file.

(Appx145, 55:50-56:16).

**Claim 2 of U.S. Patent No. 7,464,040:**

2. A computer-implemented method, comprising:

storing information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers, in a database or a memory device, wherein the information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers, includes a healthcare record or a healthcare history of, for, or associated with, each individual of the plurality of individuals, including a healthcare record or a healthcare history of, for, or associated with, an individual, information regarding a healthcare practice of, and an insurance accepted by, each of the plurality of healthcare providers, including information regarding a healthcare practice of, and an insurance accepted by, a healthcare provider, information for processing or for storing information regarding a healthcare diagnosis or a healthcare treatment, and information for submitting an insurance claim to a healthcare insurer or a healthcare payer associated with the individual;

receiving information regarding the individual with a receiver, wherein the information regarding the individual is transmitted from a first computer or from a first communication device, wherein the first computer or the first communication device is associated with or is used by the healthcare provider, and further wherein the receiver is associated with the database or the memory device and is located at a location remote from the first computer or remote from the first communication device, wherein the information regarding the individual is transmitted to the receiver via, on, or over, at least one of the Internet and the World Wide Web, and further wherein the information regarding the individual contains information regarding at least one of a symptom, an examination finding, a diagnosis, a treatment, an administration of a treatment, and a procedure;

at least one of storing the information regarding the individual in the database or the memory device and updating the healthcare record or the healthcare history of, for, or associated with, the individual;

generating an insurance claim, wherein the insurance claim is automatically generated by a processing device in response to the storing of the information regarding the individual in the database or the memory device

or the updating of the healthcare record or the healthcare history of, for, or associated with, the individual, wherein the insurance claim is suitable for being automatically submitted to the healthcare insurer or the healthcare payer associated with the individual or is suitable f or being automatically transmitted to a second computer or to a second communication device, wherein the second computer or the second communication device is associated with the healthcare insurer or the healthcare payer associated with the individual; and

transmitting the insurance claim to the second computer or to the second communication device.

(Appx83, 47:40-48:29).

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

**Case Number**   2023-1302

**Short Case Caption**   Epic Systems Corporation v. Decapolis Systems, LLC

**Filing Party/Entity**   Epic Systems Corporation

---

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  05/08/2023

Signature:  /s/ Kristin Graham Noel

Name:  Kristin Graham Noel

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Epic Systems Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable      ☐   Additional pages attached

| Kelli A. Edson | Martha Jahn Snyder | Anita Marie Boor |
|---|---|---|
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable      ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................ vii

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION ............................................................................. 1

STATEMENT OF THE CASE AND FACTS ................................... 2

    A.    The Patents-at-Issue. .......................................................... 3

        1.    The '048 Patent. ................................................... 5

        2.    The '040 Patent. ................................................... 8

    B.    Procedural History. ........................................................ 12

        1.    The district court proceedings. .................................. 12

        2.    The district court's order on Rule 12 motion. ........... 15

SUMMARY OF THE ARGUMENT ............................................... 18

ARGUMENT .................................................................................... 21

    I.    STANDARD OF REVIEW. ................................................. 21

    II.    THE PATENTS-AT-ISSUE ARE INVALID UNDER § 101 ....... 22

    A.    Step One: The Claims are Directed to the Abstract
Idea of Organizing Patient Health Information. .................. 24

        1.    Updating patient information and generating
insurance claims are inherently abstract. ................... 25

        2.    The Patents-at-Issue's alleged problems are all
healthcare problems, not technological
problems. ............................................................. 29

        3.    The Patents-At-Issue do not improve computer
capabilities. .......................................................... 30

        4.    The Patents-at-Issue do not recite "specific
rules" or technical details for accomplishing the
invention. ............................................................. 35

        5.    The claims are analogous to those in *Joao II* and
*In re Salwan*. ....................................................... 40

i

B.      Step Two: The Claims Do Not Recite an Inventive Concept. ...............................................................42

      1.    The record is void of an inventive concept. ..............43

      2.    The Claims rely on nothing more than generic computer components................................51

      3.    The Asserted Claims fail the machine-or-transformation test ......................................54

III.    THE DISTRICT COURT PROPERLY DENIED DECAPOLIS' MOTION FOR LEAVE TO FILE AMENDED COUNTERCLAIMS...............................56

A.      Decapolis did not meet the standard for leave to amend. ..................................................57

      1.    Decapolis failed to establish good cause under Rule 16.......................................................57

      2.    The district court was well within its discretion under Rule 15 to deny Decapolis' motion.................58

B.      The proposed amendment was properly denied as futile. ...................................................59

      1.    The proposed amendment contains conclusory allegations. ................................................59

      2.    The proposed amendment does not raise any factual disputes. ...........................................59

CONCLUSION ....................................................................61

## TABLE OF AUTHORITIES

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ....................................................... 27

*Alice Corp. v. CLS Bank, Int'l*,
  573 U.S. 208 (2014) ............................................................... passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) ....................................................... 46

*Appistry, Inc. v. Amazon.com, Inc.*,
  195 F. Supp. 3d 1176 (W.D. Wa. 2016) ............................................... 60

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) ....................................................... 51

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................. 59

*Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*,
  703 F. App'x 986 (Fed. Cir. 2017) .................................................... 54

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ................................................... 45, 50

*Bilski v. Kappos*,
  561 U.S. 593 (2010) .................................................................. 38

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) .................................................. passim

*Burger King Corp. v. Weaver*,
  169 F.3d 1310 (11th Cir. 1999) ....................................................... 61

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ................................................ 29, 31, 32

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
  681 F. App'x 950 (Fed. Cir. 2017) .................................................... 23

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017) ................................................................. 31, 32

*cxLoyalty, Inc. v. Maritz Holdings, Inc.*,
986 F.3d 1367 (Fed. Cir. 2021) ........................................................................ 60

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ................................................................. 46, 56

*Decapolis Sys., LLC v. Epic Sys. Corp.*,
No. 6:21-cv-00434 (W.D. Tex. Apr. 29, 2021) ................................................ 12

*Electric Power Group v. Alstrom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ................................................... 46, 47, 48, 51

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ......................................................... 19, 22, 40

*Ex Parte Joao* ("*Joao I*"),
No. 2016-003277, 2017 WL 2377811 (P.T.A.B. May 23, 2017) .................. 41

*Ex Parte Joao* ("*Joao II*"),
No. 2016-002070, 2017 WL 2303383 (P.T.A.B. May 25, 2017) .................. 41

*First Specialty Ins. Corp. v. 633 Partners, Ltd.*,
300 F. App'x 777 (11th Cir. 2008) .................................................................. 13

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. 2021) ........................................................................ 38

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ................................................................. 51, 57

*Game & Tech. Co. v. Wargaming Grp. Ltd.*,
942 F.3d 1343 (Fed. Cir. 2019) ........................................................................ 51

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ........................................................................ 58

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008) ................................................................. 21, 57

iv

*Hawk Tech. Sys., LLC v. Castle Retail, LLC,*
    60 F.4th 1349 (Fed. Cir. 2023) ................................................................. passim

*iLife Techs., Inc. v. Nintendo of Am., Inc.,*
    839 F. App'x 534 (Fed. Cir. 2021) ...................................................... 38, 51, 52

*In re Greenstein,*
    782 F. App'x 1035 (Fed. Cir. 2019) .................................................................. 39

*In re Salwan,*
    681 F. App'x 938 (Fed. Cir. 2017) .................................................................... 41

*In re TLI Commc'ns LLC Pat. Litig.,*
    823 F.3d 607 (Fed. Cir. 2016) ................................................................. passim

*Intell. Ventures I LLC v. Capital One Fin. Corp.,*
    850 F.3d 1332 (Fed. Cir. 2017) ........................................................................ 43

*Martin v. Automobili Lamborghini Exclusive, Inc.,*
    307 F.3d 1332 (11th Cir. 2002) ........................................................................ 61

*McKeever v. Liberty Mut. Grp. Inc.,*
    487 F. App'x 487 (11th Cir. 2012) .................................................................... 58

*Mortg. Application Techs., LLC v. MeridianLink, Inc.,*
    839 F. App'x 520 (Fed. Cir. 2021) ............................................................ 38, 53

*OIP Techs., Inc. v. Amazon.com, Inc.,*
    788 F.3d 1359 (Fed. Cir. 2015) ........................................................................ 31

*People.ai Inc., v. Clari Inc.,*
    No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) .................. passim

*S. Grouts & Mortars, Inc. v. 3M Co.,*
    575 F.3d 1235 (11th Cir. 2009) ........................................................................ 58

*Sanderling Mgmt. Ltd. v. Snap Inc.,*
    65 F.4th 698 (Fed. Cir. 2023) ...................................................... 21, 22, 59, 60

*Simio, LLC v. FlexSim Software Prods., Inc.,*
    983 F.3d 1353 (Fed. Cir. 2020) ........................................................................ 22

*Solutran, Inc. v. Elavon, Inc.*,
   931 F.3d 1161 (Fed. Cir. 2019) ............................................................ 29, 55, 56

*Sosa v. Airprint Sys., Inc.*,
   133 F.3d 1417 (11th Cir. 1998) ............................................................... 21, 57

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ................................................................ 33, 42

*Thomas v. Clayton Cnty. Bd. of Comm'rs*,
   No. 22-10762, 2023 WL 1487766 (11th Cir. Feb. 3, 2023) .......................... 21

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
   916 F.3d 1363 (Fed. Cir. 2019) ............................................................. passim

*Wade v. Daniels*,
   36 F.4th 1318 (11th Cir. 2022) ...................................................................... 22

*Windy City Innovations, LLC v. Facebook, Inc.*,
   411 F. Supp. 3d 886 (N.D. Cal. 2019),
   *aff'd*, 835 F. App'x 610 (Fed. Cir. 2021) ...................................................... 32

## **STATEMENT OF RELATED CASES**

The following district court case has been stayed pending the outcome of this appeal:  *Decapolis Sys., LLC v. UT Southwestern Health Sys.*, No. 2:22-cv-00159-JRG-RSP, Dkt. 68 (E.D. Tex. Jan. 11, 2023).

## JURISDICTIONAL STATEMENT

Epic Systems Corporation disagrees with Decapolis' Jurisdictional Statement to the extent it contains improper argument that the district court's challenged rulings were erroneous.

## INTRODUCTION

In *Alice Corporation v. CLS Bank, International*, the Supreme Court held that non-inventive abstract ideas fall outside the allowable subject matter under 35 U.S.C. § 101. 573 U.S. 208, 216 (2014). Both patents on appeal—prosecuted and issued before *Alice*—fail to claim patentable subject matter under the *Alice* test.

U.S. Patent No. 7,464,040 ("the '040 Patent") is directed to the idea of generating and transmitting insurance claims in connection with patient information that is sent and received. U.S. Patent No. 7,490,048 ("the '048 Patent", and collectively with the '040 Patent, "The Patents-at-Issue") is directed to the idea of processing requests to access and change patient information and generating and transmitting messages in connection with that process. These are quintessential abstract concepts—and not new ones at that. People have been sending and receiving information, requesting access to information, and generating messages based on that information for eons.

Neither Patent imbues these abstract ideas with any inventive concept. They do not teach any novel means of *how* to accomplish the abstract ideas. Contrary to

Decapolis' assertions, the Patents-at-Issue do not describe improvements to the functionality of a computer or network platform itself. Rather, the Patents-at-Issue claim and describe using generic computers and computer components to perform human tasks that have historically been performed by pen and paper. Any benefits from automating the described activities using a computer come not from a claimed aspect of Decapolis' inventions, but merely from the computer's conventional ability to automate. Finally, the district court correctly denied Decapolis' untimely and unsupported motion for leave to amend its counterclaims to add an expert report from another lawsuit in another venue not involving Epic. Decapolis neither explained its delay nor pointed to any of the "uncontested facts" it now claims are relevant. Regardless, as the district court properly found, the motion was futile. Accordingly, the Court should affirm the district court's ruling and hold the Patents-at-Issue are patent-ineligible under § 101.

## STATEMENT OF THE CASE AND FACTS

This appeal arises from a lawsuit that Plaintiff-Appellee Epic Systems Corporation ("Epic") filed against Defendant-Appellant Decapolis Systems, LLC ("Decapolis") seeking a declaratory judgment of non-infringement and patent invalidity of the Patents-at-Issue. Epic filed the declaratory judgment action against Decapolis in the Southern District of Florida, Decapolis' hometown, after the non-

practicing entity engaged in a campaign of baseless lawsuits against Epic and its customers in the Western District of Texas.[1]

The district court held that both of the Patents-at-Issue were invalid under § 101, explaining that "the Patents address problems with keeping patient's records on paper by moving said record keeping" onto a computer and that "[Decapolis'] Patents do not claim any improvement in the hardware of computers" because "[s]imply using a computer to implement a process does not make a Patent 'concrete.'" (Appx13-14).

### A.    The Patents-at-Issue.

The Patents-at-Issue teach concepts regarding the abstract idea of recordkeeping activities—activities that are quintessential human tasks—using a computer. As the district court found, the '040 Patent teaches "the abstract idea of billing insurance companies and organizing patient information." (Appx14). The '040 Patent seeks to address the problems that insurance claims "typically…take place in a paper-based environment and, as a result are slow and inefficient," and that "[f]raudulent claims and/or claims which cannot be verified." (Appx60, 2:8-15; Appx118, 2:8-15). The '040 Patent describes a solution to these problems, namely a "computer implemented method" including:

---

[1] Decapolis also filed dozens of other lawsuits on the Patents. (Appx2, Appx355-357).

generating an insurance claim, wherein the insurance claim is automatically generated by a processing device in response to the storing of the information or the updating of the healthcare record or the healthcare history, which insurance claim is suitable for being automatically submitted to the healthcare insurer or payer associated with the individual or is suitable for being automatically transmitted to a second computer or communication device associated with the healthcare insurer or payer, and transmitting the insurance claim to the second computer or communication device.

(Appx34, Abstract).

The '048 Patent teaches "organizing patient information and communicating with patients." (Appx14). The claimed invention of the '048 Patent seeks to address the problem "that the main source of patient information [and] medical histories…upon which doctors or providers may base their diagnoses and/or treatments" are "questionnaires or forms" and/or "preliminary interviews" with doctors. (Appx118, 1:50-56; Appx60, 1:50-56). Such information "may not necessarily result in sufficient, comprehensive, and/or accurate, information being obtained regarding the patient" and "[f]urther, there is no guarantee that the same information will be provided, in a uniform manner" and "[a]s a result, patient information may not be uniformly distributed and/or be available to providers at the point of treatment and/or otherwise." (Appx118, 1:58-65; Appx60, 1:58-65).

The '048 Patent describes the following solution to this problem in the surgical context: "For example…[a] patient scheduled for surgery on a certain body part (i.e., left ankle) may enter the hospital. Due to a hospital clerical error, the right

ankle is noted to be operated on." (Appx133, 31:17-21; Appx74, 30:19-23). Prior to the surgery the surgeon can access the patient's medical records and "investigate the situation and ensure that the correct…procedure is performed" (Appx133, 31:22-30; Appx74, 30:24-32), and that "[i]n this manner, the present invention can be utilized to pre-screen subsequent and/or follow-up treatments and/or procedures so as to prevent healthcare mistakes" (Appx133, 31:36-38; Appx74, 30:38-40). Decapolis also explained to the district court that "the Patent Claims solve the technical problem facing the industry in 1999 associated with doctors or other providers not always having the latest information and/or research material available to them prior to, and/or during, the diagnosis and/or treatment process." (Decapolis' Opening Brief, Dkt. 12 ("Br.") at 21-22; Appx531).

### 1.    The '048 Patent.

The '048 Patent contains three independent claims: Claims 1, 2, and 20. Claim 1 recites an apparatus comprising (1) a processor that processes a request, makes a determination regarding that request, and generates a notification regarding that request, and (2) a transmitter that transmits the notification regarding that request. Claim 2 recites a computer-implemented method comprising steps of (1) processing a request, (2) generating a message based upon the request, and (3) transmitting the message. Claims 2 and 20 are both method claims and recite nearly identical limitations, with Claim 20 adding the limitations of (1) a receiving step,

wherein, for example, a computer receives information regarding a user's request, and (2) a determining step, wherein, for example, the computer determines whether a user is authorized to access a patient's healthcare records. (Appx140, 45:65-46:9). As Epic argued before the district court, and Decapolis did not dispute, Claim 2 is exemplary. Thus, Epic summarizes it below:

**Processing, with a processor.** The specification discloses that "[t]he apparatus of the present invention includes a central processing computer or central processing computer system which can be a network or server computer. The apparatus also includes a healthcare provider communication device or computer" and that "[t]he healthcare provider computer(s) can communicate with, and operate in conjunction with, the central processing computer and/or any of the other computers and/or computer systems or communication devices described herein." (Appx119, 3:4-14; *see also* Appx145, 55:51-55). The processing performed by the central processing computer is done by a processor, which the specification discloses as follows: "In the preferred embodiment, the central processing computer 10 includes a central processing unit or CPU 10A, which in the preferred embodiment, is a microprocessor. The CPU 10A may also be a microcomputer, a minicomputer, a macro-computer, and/or a mainframe computer, depending upon the application." (Appx126, 17:12-17). The central processing computer can also include a database that "can contain any and/or all of the data and or [sic] information

which is needed to perform the various processing methods, services, functions and/or operations, described herein." (Appx119, 4:16-30).

**Generating a message.** The specification discloses that "the present invention" can be programmed to "generate and/or transmit any of the e-mails, electronic message transmissions, electronic notification transmissions, and/or any of the communications, described herein, between any of the parties" automatically. (Appx121, 7:59-64; *see* Appx123, 11:53-59). The specification further discloses that message generation is performed, for example, by the central processing computer which can "generate and/or transmit an e-mail message, a beeper or pager message, and/or a telephone call, and/or other communication" to a requesting party's communication device (Appx135, 36:44-48), which the specification explains can be "any computer or communication device" (Appx125, 15:65-16:1).

**Transmitting.** The specification discloses that "[e]ach of the central processing computer(s), the provider computer(s), the payer computer(s), the patient computer(s), and/or the intermediary computer(s), can transmit information to, as well as receive information from, any of the computers described herein." (Appx119, 3:41-45).

The specification explains that transmission can occur using "a communication network, a telecommunication network, a telephone network, a line-connected network, and/or a wireless communication network," as well as "the

Internet and/or the World Wide Web and/or on, or over, any other communication network or system." (Appx119, 3:55-61).

### 2.    The '040 Patent.

The '040 Patent contains three independent claims—Claims 1, 2, and 46. Claim 1 recites an apparatus comprising (1) a receiver that receives information, for example patient healthcare information, (2) a database or memory device that stores information, for example patient healthcare information, and (3) a processor that processes the exemplary patient healthcare information and generates and transmits an insurance claim regarding said patient healthcare information. Claim 46 recites a computer-implemented method comprising steps of (1) storing information, for example patient healthcare records, (2) receiving information, for example patient healthcare information and/or records, (3) storing new patient healthcare information and updating existing stored patient healthcare records with the new healthcare information, (4) automatically generating an insurance claim, using a processing device, regarding the updated patient healthcare records, and (5) transmitting the insurance claim. Claims 2 and 46 are both method claims and recite nearly identical limitations, with Claim 2 adding that the information regarding the individual is transmitted over the Internet. As Epic argued before the district court, and Decapolis did not dispute, Claim 2 is exemplary. Thus, Epic summarizes it below:

**Storing.** The specification discloses the "storing" step as being performed in a "database" by the invention's central processing computer (Appx67, 16:53-56; Appx83, 47:44-45) or by another communication device (*see, e.g.*, Appx70, 22:30-34), and comprises "[t]he data and/or information, described as being stored in the various databases…can be continuously updated so as to store the latest values for the data and/or information and can be stored and be made available for future processing routines," and "[a]ny and/or all of the data and/or information described herein as being stored in any of the various databases…can be updated via inputs from any of the computers and/or communication devices described herein, and/or external computers or communication devices." (Appx63, 7:46-58). The central processing computer "is a network computer or computer system, or any other communication device." (Appx67, 16:13-15).

**Receiving.** The specification discloses the "receiving" step as comprising "receiving information regarding the individual, transmitted from a first computer or communication device associated with or is used by a healthcare provider" wherein the information may comprise any healthcare information, records, or history of an individual. (Appx34, Abstract; Appx83, 47:61-66, 48:5-9). The "receiving" is done by a "central processing computer(s),…patient computer(s)," or "any of the computers described" in the specification. (Appx61, 3:34-38). The receiver doing the receiving is a component of "[e]ach of the central processing

computer(s), as well as each of the computers or communication devices associated with each of the [] users" disclosed in the specification, and is associated with that device's processor, transmitter, memory device, and database. (Appx61, 4:9-23).

**Storing and updating.** The specification discloses the "storing and updating" step as one where "storing of the information [regarding a patient] or updating of the [patient's] healthcare record or [] healthcare history" (Appx34, Abstract; Appx83, 47:45-51, 48:10-13), is performed by the disclosed invention's central processing computer (Appx67, 16:53-56), or also by another communication device described in the patent (*see, e.g.*, Appx70, 22:30-34).

The specification additionally discloses "storing and updating" as aspects of the invention wherein "[t]he data and/or information, described as being stored in the various databases…can be continuously updated so as to store the latest values for the data and/or information and can be stored and be made available for future processing routines," and "[a]ny and/or all of the data and/or information described herein as being stored in any of the various databases…can be updated via inputs from any of the computers and/or communication devices described herein, and/or external computers or communication devices." (Appx63, 7:46-58).

**Generating.** The specification discloses that the "generating" step is performed by a processing device which "automatically generate[s]" an "insurance claim." (Appx34, Abstract; Appx83, 48:14-19). For example, an embodiment of the

invention specifically discloses the central processing computer "generat[ing] a claim form which can meet the formal claim submission requirements of [a] patient's payer or insurance company." (Appx79, 40:27-30; Appx83, 48:20-22).

**Transmitting.** The specification describes the "transmitting" step as being one where an "insurance claim [that] is suitable for being automatically submitted to the healthcare insurer or payer associated with the individual or is suitable for being automatically transmitted to a second computer or communication device associated with the healthcare insurer or payer, and transmitting the insurance claim to the second computer or communication device." (Appx34, Abstract; Appx83, 48:20-29).

The specification discloses that the "transmitting" occurs between " the central processing computer(s), the provider computer(s), the payer computer(s), the patient computer(s), and/or the intermediary computer(s), can transmit information to, as well as receive information from, any of the computers described herein," and that "each of the computers can communicate with, process information from, and/or share data and/or information with, each other and/or any other computer or computers described herein." (Appx61, 3:34-41). The specification explains that transmission can occur using "a communication network, a telecommunication network, a telephone network, a line-connected network, and/or a wireless communication network," as well as "the Internet and/or the World Wide Web

and/or on, or over, any other communication network or system." (Appx61, 3:48-54).

## B. Procedural History.

### 1. The district court proceedings.

Decapolis initially sued Epic in the Western District of Texas, alleging infringement of the Patents-at-Issue in this appeal. *Decapolis Sys., LLC v. Epic Sys. Corp.*, No. 6:21-cv-00434, Dkt. 1 (W.D. Tex. Apr. 29, 2021). As venue was improper, Epic filed a Motion to Dismiss. *Id.*, at Dkt. 10 (W.D. Tex. June 22, 2021). Instead of responding to the motion, Decapolis initiated lawsuits against two of Epic's customers in the W.D. of Texas, alleging that their use of Epic's software infringes the same patents,[2] and then voluntarily dismissed the Epic case without prejudice. *Decapolis*, No. 6:21-cv-00434, at Dkt. 24 (W.D. Tex. Dec. 20, 2021).

To consolidate the dispute and protect its customers, Epic brought this declaratory judgment action in Decapolis' home jurisdiction, the Southern District of Florida. (Appx405). Decapolis filed its Answer and Counterclaims, asserting infringement of the Patents-at-Issue. (Appx372). Thereafter, Decapolis filed another

---

[2] *Decapolis Sys., LLC v. Bexar Cnty. Hosp. Dist.*, No. 6:21-cv-01252, Dkt. 1 (W.D. Tex. Dec. 1, 2021); *Decapolis Sys., LLC v. Cent. Tex. Cmty. Health Ctrs.*, No. 6:21-cv-01262, Dkt. 1 (W.D. Tex. Dec. 3, 2021).

lawsuit against two additional Epic customers in the Eastern District of Texas, asserting Epic's software infringed the same patents.[3]

On May 20, 2022, Epic moved for judgment on the pleadings under Rule 12(c), arguing that the Patents-at-Issue were patent-ineligible under 35 U.S.C. § 101. (Appx327; Appx332-333). Briefing was complete on June 9, 2022. (Appx546). Starting two months later, Decapolis repeatedly attempted to manufacture an issue of fact by seeking to introduce an expert report that Decapolis obtained for a separate set of lawsuits not involving Epic (the "Arrigo Report"). (Appx562-563).

Specifically, Decapolis first filed a Motion for Leave to File Sur-Reply attaching the Arrigo Report. (Appx562-563). Decapolis failed to show any basis for a sur-reply, such as new evidence or arguments raised by Epic in its reply brief (*see First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008)), but rather baldly asserted that the Arrigo Report "creates an issue of fact, at the least, of whether the patents in suit provide an inventive concept, Step Two of [sic] *Alice* analysis." (Appx572-573).

On August 10, 2022, the district court denied Decapolis' Motion for Leave to file Sur-Reply. (Appx574). The district court held that "there is [no] basis to permit a sur-reply," and that it would not "be appropriate for the court to consider an expert

---

[3] *Decapolis Sys., LLC v. UT Southwestern Health Sys.*, No. 2:22-cv-00159, Dkt. 1 (E.D. Tex. May 17, 2022).

report on a motion for judgment on the *pleadings*, let alone an expert report prepared to support a summary judgment motion in a separate litigation to which [Epic] is not a party." *Id.* (emphasis in original).

On September 26, 2022, over three months after the Rule 12(c) briefing closed, Decapolis filed a Motion for Leave to File First Amended Counterclaims, seeking to attach the Arrigo Report to the pleading. (Appx29). The district court denied Decapolis' motion because Decapolis failed to comply with S.D. of Florida Local Rule 7.1(a)(3), the meet and confer requirement. (*Id.*). On October 3, 2022, Decapolis refiled its motion. (Appx152-155). Decapolis' proffered amended counterclaims included one new paragraph that added a reference to the Arrigo Report and introduced the Arrigo Report as an exhibit attached therein. (Appx164; Appx185). The sole new paragraph recites:

> An expert opinion of Michael Arrigo was filed in support of Plaintiff's Opposition to Motion for Summary Judgement of Invalidity in Decapolis Systems, LLC v. Medical Software Solutions, Inc., Case No. 6:21-cv-00607-ADA, Western District of Texas, with the same patents in suit. **See Exhibit A.** Mr. Arrigo opined that the claims of the Asserted Patents are not abstract. **See Ex. A.**

(Appx164).

The district court denied Decapolis' motion to amend its counterclaims. (Appx1-3). The district court explained that "[s]tarting with Rule 16, [Decapolis] failed to establish good cause" to make its requested amendment. The district court held Decapolis lacked diligence in attempting to amend its counterclaims to include

14

expert analysis obtained after the pleadings had closed, and some 19 months after first asserting the patents.[4] (Appx2). The district court held that Decapolis had a weak case under Rule 15 because of Decapolis' lack of diligence, and that the "timing and posture" of its conduct "support[ed] an inference of dilatory motive," that including the Arrigo Report "would likely require re-briefing of [Epic's Rule 12(c) motion]," and that "such an 'amendment' would be futile because on a judgment on the *pleadings*, an expert report would not be appropriate to consider." (Appx2-3) (emphasis in original).

### 2.     The district court's order on Rule 12 motion.

On December 1, 2022, the district court granted Epic's Rule 12(c) motion. (Appx4-16). The district court held that the Patents-at-Issue were patent-ineligible under § 101. (Appx16). The district court held that under *Alice* Step 1, the '040 Patent is directed to "the abstract idea of billing insurance companies and organizing patient information," and that the '048 Patent is directed to "organizing patient information and communicating with patients." (Appx14). Under *Alice* Step 2, the district court held that both Patents-at-Issue fail to recite an inventive concept and instead claim using only conventional computers. (Appx15-16).

---

[4] "What showing of diligence does [Decapolis] make to overcome its delay? Just that: 'an expert now opin[es] on the Section 101 issues of the patents in suit.' (DE 72 at 2). That alone is insufficient to demonstrate diligence. This is especially true considering that Defendant has been litigating this very patent since at least April 2021." (Appx2).

The district court rejected Decapolis' primary arguments that Epic's Rule 12(c) motion was premature because the district court had not performed claim construction and because factual disputes precluded the district court from making a proper § 101 determination. The district court held claim construction was not necessary because Decapolis provided no proposed constructions for its claim terms, Decapolis stated no specific constructions were required and that each term "should be read according to its plain and ordinary meaning," and because the district court determined itself that the terms should be assigned their plain and ordinary meaning. (Appx7-8).

The district court held no factual allegations prevented determining patent eligibility under § 101. Decapolis' claimed technological improvements "[do] not preclude this Court's ability to examine the Patents' eligibility under § 101 because the alleged improvements, viewed in light of the Specifications and Claims [], are nonetheless ineligible under § 101." (Appx8-9).

The district court addressed Decapolis' attempts to introduce the Arrigo Report into the record. (Appx9). The district court referred to its lengthy explanation of why it denied the motion, and further held that "[Decapolis'] proposed expert report would not have precluded this Court's ability to examine the Patents' eligibility under § 101 because it does not raise any plausible factual disputes after

drawing all reasonable inferences in favor of [Decapolis]." (Appx9; *see contra* Br. 29).

The district court rejected Decapolis' arguments under *Alice* step one that "its Patents are not directed to an abstract idea 'when the Patent Claims are considered as a whole' and 'in light of the Specification.'" (Appx13). Specifically, the district court rejected Decapolis' argument that Epic oversimplified the asserted claims' teachings and that the Patents-at-Issue are "'directed to technological improvements in electronic healthcare record systems, computer systems used in connection with electronic healthcare records, and telehealth systems,'" and that "'no one was doing this [at the time of invention].'" *Id*. The district court held that Decapolis "mischaracterize[d] the law by appearing to argue that because its Patents may be useful it must follow they are not directed to an abstract idea" and instead Decapolis "[did] not cite to, and [that the district court could] not find, any claim language to support [Decapolis'] assertion that its claims are directed to 'technological improvements.'" *Id*. The district court held the Patents-at-Issue merely "address problems with keeping patient's records on paper" by keeping them on a computer instead. (Appx13-14). The district court additionally held the Patents-at-Issue do not claim a concrete form despite Decapolis' assertions otherwise because "[Decapolis'] Patents do not claim any improvement in the hardware of computers," and that

"[s]imply using a computer to implement a process does not make a Patent 'concrete.'" (Appx14).

The district court rejected Decapolis' arguments under *Alice* step two that "its Patents provide 'something more' when analyzed under the machine-or-transformation test," specifically that the Patents-at-Issue are "'tied to a specialized processing device that allows for linking both current and previous providers, and that allows for the updated patient information," and also "tied to a memory device and a transmitter." (Appx15). The district court held that Decapolis "[s]imply saying that its Patents claim a 'specialized processing device' does not make it so," and "[Decapolis'] Patents actually say that 'any computer' or 'any other communication device' can carry out the claimed elements." *Id*. The district court concluded its step two analysis by holding "[Decapolis'] assertions…do not change the plain meaning of its Patents—there is no claimed machine or apparatus." (Appx15-16).

## SUMMARY OF THE ARGUMENT

The Patents-at-Issue are ineligible because they fail to recite significantly more than a desire to computerize or automate age-old paper health recordkeeping and insurance billing. People have been sending and receiving information, requesting access to information, and generating messages based on that information for ages. The Patents-at-Issue describe how human shortcomings risk patient health and suggest a solution to automate the process with generic computer components.

Because the claims add nothing to the idea of a computer performing the same abstract functions using generic "rules," the claims are ineligible for reciting "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).

This Court has held that these and similar functions are patent ineligible abstract ideas. *See, e.g.*, *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367-68 (Fed. Cir. 2019) (replacing traditional patient information gathering "pen and paper methodologies" with a conventional computer is an abstract idea); *People.ai Inc., v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at * 11 (Fed. Cir. Apr. 7, 2023) (nonprecedential) (replacing "longstanding manual process" of updating systems of records with an automated computerized process abstract).

Decapolis makes several broad, and unsupported, counterarguments that it attempts to apply to each of the Patents-at-Issue. These arguments are unsound.

*First*, Decapolis attempts to reshape the Patents-at-Issue's focus by arguing the claims solve computer problems with technological improvements. (Br. 13-14). Yet, Decapolis identifies neither any such computer problems nor the technological improvements thereto; they are not found in the Patents-at-Issue. (*See infra* Secs. II.A.2, II.A.3). Nor can Decapolis point to any specific rules or technical details, opting to instead describe the system and methods in purely functional terms. (*Id.*, Sec. II.A.4). The Patents-at-Issue are directed to overcoming certain "problems with

the current healthcare system" rooted in paper-based health records by adopting off-the-shelf computer components. (*Id.*, Sec. II.A.2).

*Second*, under *Alice* step two, Decapolis argues the Patents-at-Issue disclose an inventive concept but fails to cite evidentiary support. (Br. 22-25). Decapolis posits the claims capture "unconventional technological improvements," such as a processor "unconventionally assess[ing] credentials" and a transmitter "unconventionally communicat[ing] with a patient communication device," but beyond inserting the word "unconventionally," Decapolis merely recites the problems identified by the Patents-at-Issue. As with the Patents-in-Suit, Decapolis identifies an abstract idea on a set of generic computer components without identifying any inventive concepts or improvements.

*Third*, Decapolis' reliance on the machine-or-transformation test (Br. 27-28) fails because merely using generic computer components does not suffice under that test. (*See infra* Sec. II.B.3). Moreover, even if Decapolis' claims could pass the machine-or-transformation test, they would still be insufficient under *Alice* step two. (*Id.*).

*Finally*, Decapolis argues that the district court abused its discretion by denying Decapolis leave to amend its counterclaims nearly five months after the court's amendment deadline, and nearly four months after Epic filed its Rule 12 motion. The proposed amendment sought to attach an expert report prepared and

served in an unrelated litigation against other parties in the W.D. Texas. At the outset, Decapolis offered no justification for the delay, failing Rule 16. *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998). Decapolis similarly made no showing under the Rule 15 factors. Nor did Decapolis recite any of the "uncontested facts" that it now argues on appeal—thus they are waived. *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322–23 (Fed. Cir. 2008). Regardless, the expert's assertions on patentability do not raise a factual issue. *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705-06 (Fed. Cir. 2023).

The district court correctly held that the Patents-at-Issue's claims fail to recite significantly more than the trivial computerization of organizing patient information, communicating with patients, and billing insurance companies long performed by humans. This Court should affirm.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW.**

Decapolis' standard of review on the motion to dismiss is incomplete in that it fails to acknowledge that "the district court was only required to treat well-pleaded facts as true—not [Decapolis'] 'naked assertions' or legal conclusions." *Thomas v. Clayton Cnty. Bd. of Comm'rs*, No. 22-10762, 2023 WL 1487766, at *4 (11th Cir. Feb. 3, 2023) (per curiam).

Decapolis failed to recite the standard of review on the motion to amend.

When reviewing a district court decision on a motion to amend, this Court applies the same standard of review as the applicable regional circuit. *Sanderling*, 65 F. 4th at 702. In the Eleventh Circuit, the denial of a motion to amend is reviewed for abuse of discretion, but the underlying legal conclusion that an amendment would be futile is reviewed *de novo*. *Wade v. Daniels*, 36 F.4th 1318, 1328 (11th Cir. 2022).

## II.     THE PATENTS-AT-ISSUE ARE INVALID UNDER § 101.

In *Alice Corp. v. CLS Bank*, the Supreme Court provided a two-step framework for analyzing subject matter eligibility under § 101. 573 U.S. 208 at 217-18. First, this Court must determine whether the claims are directed to an "abstract idea." *Id.* at 218. As applied to claims involving computerized systems, courts "consider whether the 'focus of the claims' is on a 'specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an 'abstract idea' [like organizing human behavior or mental processes] for which computers are invoked merely as a tool.'" *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285–86 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1336); *see also Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (must consider the claim's "key advance"). Under step one, this Court "examine[s] what the patent asserts to be the focus of the claimed advance" by considering "the language of the asserted claims, considered in light of the specification." *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023).

"If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one." *BSG Tech*, 899 F.3d at 1285–86. The "directed to" inquiry may involve looking to the specification to understand "the problem facing the inventor" and, ultimately, what the patent describes as the invention. *See In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016).

Second, if the claims are determined to be directed to an abstract idea, this Court next considers "whether the claims contain an 'inventive concept' sufficient to 'transform the nature of the claim into a patent-eligible application.'" *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 953-54 (Fed. Cir. 2017) (nonprecedential) (quoting *Alice*, 573 U.S. at 217). This "transformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, 573 U.S. at 221. "[I]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech*, 899 F.3d at 1285–86. "Narrowing or reformulating an abstract idea does not add 'significantly more' to it." *Id.* at 1291.

As the district court correctly held, the claims of the Patents-at-Issue are invalid under § 101 because they are directed to the abstract idea of managing patient information (*i.e.* insurance claims and patient records) traditionally stored in paper

form, and they fail to recite any means of accomplishing the automation beyond the basic process of applying generic computer components to automate the traditionally manual process. As Decapolis did in its opening brief, Epic treats the '048 and '040 Patents together because (i) the Patents-at-Issue share the same specification, with the exception of the '048 Patent including a handful of additional figures and paragraphs for the same, and (ii) both are directed to nearly the same abstract idea of organizing patient health information, with the '040 Patent expanding its focus to generating insurance claims with the same information. Any material differences between the Patents-at-Issue that impact § 101 are called out below.

## A.  Step One: The Claims are Directed to the Abstract Idea of Organizing Patient Health Information.

The Patents-at-Issue claim a computer-implemented process for managing patient information traditionally stored in paper format. (Appx556-557; Appx34, Abstract; Appx88, Abstract). The '048 Patent is directed to the abstract idea of organizing patient health records and generating messages in connection with that process. (Appx139-141, 44:64-47:59; Appx336-337). The '040 Patent is directed to the abstract idea of sending and receiving patient health records and generating and transmitting insurance claims in connection with that information. (Appx34, Abstract; Appx336). As this Court has explicitly held, the bare idea of computerizing traditionally human processes with generic objective "rules" is a patent-ineligible abstract idea. *People.ai*, 2023 WL 2820794, at *11. Because the claims here do no

more, they are "directed to" the abstract idea itself. The Asserted Claims lack sufficient recitation of *how* the purported invention improves the functionality of computers. Rather, the Claims are "recited at such a level of result-oriented generality" that the claims amount to a mere implementation of an abstract idea. *Hawk Tech.*, 60 F.4th at 1358.

### 1. Updating patient information and generating insurance claims are inherently abstract.

The Patents-at-Issue are directed to computerizing traditionally human processes involved in updating or managing patient healthcare information and insurance claims. This Court has repeatedly held that replacing traditional patient information gathering "pen and paper methodologies" with a conventional computer is an abstract idea. *Fla. Rsch. Found.*, 916 F.3d at 1367-68; *People.ai*, 2023 WL 2820794, at * 11.

Two decisions of this Court are particularly instructive here. In *People.ai*, this Court held that claims directed to replacing a "longstanding manual process" of updating systems of records with an automated computerized process were abstract and patent ineligible under § 101. 2023 WL 2820794, at *7, 11. In particular, the patent's "claimed system accomplishe[d] the same ends using the same steps long undertaken by a [human]." *Id.* at *7. Under *Alice* step one, this Court held the asserted claims "[did] not improve computer functionality" because "[a]lthough the claimed automation of sorting correspondence may improve speed and accuracy,

this improvement comes from replacing a human with a computer in that sorting procedure," and that therefore "the focus of the claims is not on an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* at *9.

In *University of Florida Research Foundation*, this Court held a patent directed to automating the collection of "bedside patient information using pen and paper methodologies, such as flowsheets and patient charts" using a computer was patent ineligible under § 101. 916 F.3d at 1367. The patent sought to "automate 'pen and paper methodologies' to conserve human resources and minimize errors" by doing so with a computer. *Id.* This Court found the patent abstract because it failed to identify or claim "any specific improvements to the way computers operate." *Id.* at 1367-68 (internal quotations omitted). Instead, the patent claimed "programmatic action involving said machine-independent data [that] can be performed using [a]ny kind of computer system or other apparatus, including a general-purpose computer system." *Id.* at 1368 (internal quotations omitted). The patent "fail[ed] to provide any technical details for the tangible components, instead predominately describ[ing] the system and methods in purely functional terms." *Id.* In particular, "they 'facilitate data exchanges,' 'convert received data streams to a format independent of any particular bedside machine,' 'translate the data stream,' 'interpret data streams,' 'facilitate communications with the bedside machine,' and

'interpret [discrete] segments' in a 'data stream for the machine.'" *Id.*; *accord Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338, 1342-44 (Fed. Cir. 2013) (claims directed to computer program for handling insurance-related tasks by "stor[ing], retriev[ing] and manipulat[ing] data" abstract).

Like the patents in *People.ai* and *University of Florida Research Foundation*, the Patents-at-Issue expressly acknowledge that they seek to computerize or automate a previously manual process. Their specifications disclose the inventions are directed to overcoming shortcomings with patient information received and kept on paper forms by having "the central processing computer … update the patient's records in the database…" (Appx379-380, ¶ 16). The specifications further disclose that the problem the inventors sought to solve is that such manual updating is time-consuming and error prone (Appx118, 1:28-49; Appx60, 1:28-49), and that the invention's advantage is eliminating the need to do it manually (Appx118, 1:50-55; Appx60, 1:28-49). For example, information was supplied or kept "on questionnaires or forms" and the "information obtained from these questionnaires or forms … may not necessarily result in sufficient, comprehensive, and/or accurate, information being obtained regarding the patient." (Appx118, 1:50-60; Appx60, 1:50-60). The Patents-at-Issue contend the invention is directed to organizing this formerly paper-based information using "any computer or communication device." (Appx67, 15:4-14; Appx125, 15:65-16:7).

Affording Decapolis all reasonable inferences, its articulation of the Patents-at-Issue collapses down to this: The Patents-at-Issue recognized inherent problems with keeping patient records on paper, and the alleged inventions supposedly solved those problems by keeping the records electronically and updating them with computerized techniques. (Br. 13; Appx531; Appx535-536). Decapolis asserts the district court overgeneralized the claims and that the proper focus of the invention is "providing a means by which healthcare professionals and patients can readily modify and obtain patient health data at the time of treatment." (Br. 15). Even accepting Decapolis' characterization of the Patents-at-Issue, the claims are still abstract and invalid under § 101. The Patents-as-Issue purport to solve flaws with traditional paper-based record keeping by adopting conventional computer components. (*See infra* Secs. II.A.2, II.A.3; Appx145, 55:50-56:16; Appx83, 47:41-48:29). And as described in more detail below, the Patents-at-Issue only describe the components in purely functional terms, never providing any technical details or specific improvements to the way computers operate. (*See infra* Secs. II.A.3, II.A.4). Thus, as noted above and consistent with the district court's holding, computerizing a formerly paper-based system with conventional components is inherently abstract. (Appx13-14).

28

### 2.    The Patents-at-Issue's alleged problems are all healthcare problems, not technological problems.

The Patents-at-Issue do not solve a technological problem. (*Cf.* Br., 13-14). Rather, the Patents-at-Issue purport to have recognized inherent flaws with humans collecting and keeping patient records, including insurance billing related information, on paper. The Patents-at-Issue supposedly solve those problems by keeping the records electronically and updating them with conventional computerized techniques. This strongly supports that the Patents-at-Issue are directed to abstract ideas. *TLI Commc'ns*, 823 F.3d at 612 (claims abstract where problem facing inventor was not *how* to improve existing camera technology but instead methods for recording, communicating, and administering a digital image); *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767-68 (Fed. Cir. 2019); *Fla. Rsch. Found.*, 916 F.3d at 1367 (claims directed to problems with manual entry of bedside patient information are abstract).

Decapolis claims, with no cited record support, that the "focus of the claimed advance is to a solution of a problem specifically arising in the realm of computers." (Br. 14). To the contrary, Decapolis' assertions are not tethered to the claims and have no support within the specifications. *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019) ("characterizing the claim as being directed to an abstract idea is appropriate" where "the abstract idea tracks the claim language and accurately captures what the patent asserts to be the 'focus of the claimed advance

29

over the prior art'"). The Patents-at-Issue instead contemplate incorporating generic computers to address problems inherent with healthcare information managed by humans, typically on paper. For example, the specifications describe issues in maintaining up-to-date paper health records and the inefficiencies with "paper-based" insurance and benefit claims. (Appx118, 2:8-10; Appx60, 2:8-10). The claims then purport to address that problem by reciting a means to computerize this age-old process and does so by merely reciting the abstract idea using standard computer components. (Appx83, 47:41-48:29; Appx145, 55:50-56:16).

While the Patents-at-Issue reference a number of "problems with the current healthcare system," none of them relate in any way to technological issues or shortcomings. (*See* Appx118, 1:29-2:33; Appx60, 1:29-2:33). As Decapolis pled in its Counterclaims, the Patents-at-Issue were directed to using computers to solve issues stemming from patients supplying "information on questionnaires or forms just prior to seeing the healthcare provider and/or during a preliminary interview with the provider." (Appx378-379, ¶ 14). And that information is therefore not always up to date. (Appx118, 1:34-36, 1:60-65; Appx60, 1:34-36, 1:60-65).

### 3.    The Patents-At-Issue do not improve computer capabilities.

Contrary to Decapolis' assertion, the Patents-at-Issue are not directed to an improved computer system or an electronic health records solution. (Br. 13-14). The Patents-at-Issue do not, for example, claim improvements to a computer system that

previously existed for electronic health records. Instead, the Patents-at-Issue purport to introduce a computer implemented means to organize patient healthcare information using generic components. (Appx67, 16:13-15; Appx126, 17:7-8). Claims involving computerized systems are inherently abstract where they do not focus on a "specific asserted improvement in computer capabilities," but rather invoke computers merely as a tool for organizing human behavior or human processes. *BSG Tech*, 899 F.3d at 1285–86; *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017). Introducing computer implemented methods to a system that was not previously using computers does not improve the technical function of the device itself, it merely makes computers a tool for organizing human behavior or processes. *BSG Tech*, 899 F.3d at 1285–86.

The Patents-at-Issue fail to describe any technical improvements, or that the "invention involved overcoming some sort of technical difficulty," which "strongly suggests" the Patents-at-Issue are directed to an abstract idea. *ChargePoint*, 920 F.3d at 768. As this Court has held, the mere automation or computerization of "manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance*, 859 F.3d at 1055; *TLI Commc'ns.*, 823 F.3d at 612; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015)). "In those cases, the focus of the claims is not on such an improvement in

computers as tools, but on certain independently abstract ideas that use computers as tools." *Credit Acceptance*, 859 F.3d at 1055 (internal quotations omitted).

The Patents-at-Issue discuss various "healthcare problems" they seek to solve but do not state that the problems stem from deficiencies in the current technology or that a technical issue needed to be solved. The backgrounds do not even mention "computers", "network", or "electronic health records," let alone those being the focus of the claimed improvement. (Appx118, 1:28-2:34; Appx60, 1:28-2:26).

The backgrounds never mention "technology" or any derivative of the same except in a few locations to describe generic technologies the invention may utilize. (Appx119, 4:11-15; Appx123, 11:60-64; Appx126, 17:1-5; Appx143, 52:8-11, 52:42-49; Appx61, 4:4-8; Appx65, 11:24-28; Appx67, 16:7-11; Appx81, 43:38-41, 44:5-11). Likewise, contrary to Decapolis' assertion (Br. 13-14), the specifications do not mention improving existing "electronic healthcare records" solutions. *See Windy City Innovations, LLC v. Facebook, Inc.*, 411 F. Supp. 3d 886 (N.D. Cal. 2019), *aff'd*, 835 F. App'x 610 (Fed. Cir. 2021) (nonprecedential) (patents did not describe problems to be solved as technical in nature); *ChargePoint*, 920 F.3d at 767-68 (same).

To attempt to overcome this shortcoming, Decapolis baldly claims that the Patents-at-Issue "identif[y] a 'specific' improvement in computer capabilities or network functionality." (Br. 14). However, no support can be found in the Patents-

at-Issue, or Decapolis' opening brief, for such computer or network improvements. (*see* Appx13-14).

For these reasons, Decapolis' reliance on *TecSec* is misplaced. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020); (Br. 17). In *TecSec*, this Court held "[i]n light of what the claim language and specification establish, we conclude that the claims are directed to improving a basic function of a computer data-distribution network, namely, network security." 978 F.3d at 1296. In *TecSec*, the "specification elaborate[d] in a way that simultaneously show[ed] that the claims at issue [were] directed at solving a problem specific to computer data networks." *Id.* at 1295. In particular, the patent in *TecSec* "expressly identifie[d] a deficiency" with "multilevel [network] security" wherein requiring encryption keys at more than one level resulted in an "unwieldy, inflexible, and difficult to manage" network security infrastructure. *Id.* The *TecSec* patent's solution was to employ a "secure method of *labelling* files or messages that are sent . . . over a network," in conjunction with "cryptographic protection," such that computer data could be securely shared to a large group of recipients with only certain individuals able to decrypt and access the data. *Id.* (emphasis in original).

By contrast, as detailed above, the Patents-at-Issue contain no such elaboration or sophistication. The specifications fail to disclose that the inventions are rooted in computer shortcomings or problems specific to computer data or

networks. Nor do they offer any technological improvements to existing computer capabilities. Rather, the Patents-at-Issue were concerned with general health care problems stemming from flaws in human recordkeeping. The Patents-at-Issue sought to add generic computer components to organize and transmit patient information previously entrenched in paper. *See Fla. Rsch. Found.*, 916 F.3d at 1367-68 (replacing traditional patient information gathering "pen and paper methodologies" with "data synthesis technology" using a conventional computer is an abstract idea).

In *Hawk Technical*, this Court similarly distinguished *TecSec* in holding claims directed to "displaying images, converting them into a format, transmitting them, and so on" to be patent ineligible. *Hawk Tech.*, 60 F.4th at 1357. The patentee in *Hawk Technical* argued the claims were directed to a solution to the technical problem of "conserving bandwidth while preserving data," the solution being "a multi-format digital video product system capable of maintaining full-bandwidth resolution while providing professional quality editing and manipulation of images." *Id.*

However, like Decapolis' assertions here, the *Hawk Technical* patentee's assertions had no support in the language of the patent's claims. As the court held, "the claims themselves do not disclose performing any 'special data conversion' or otherwise describe how the alleged goal of 'conserving bandwidth while preserving

data' is achieved. Nor, as the district court found, do the claims (or the specification) explain 'what th[e] [claimed] parameters are or how they should be manipulated.'" *Id.* In distinguishing the patents found eligible in *TecSec*, which "provided a specific solution for computer data networks and required specific features," the claims "fail to recite a specific solution to make the alleged improvement." *Id.* at 1357-58. As with the Patents-at-Issue, the *Hawk Technical* patent claims lack "sufficient recitation of *how* the purported invention improve[s] the functionality of video surveillance systems and are recited at such a level of result-oriented generality that those claims amount[ ] to a mere implementation of an abstract idea." *Id.* at 1358 (emphasis supplied) (quotation marks omitted).

### 4. The Patents-at-Issue do not recite "specific rules" or technical details for accomplishing the invention.

The Patents-at-Issue adopt generic computer components as mere conduits for the Patents-at-Issue's abstract idea. In particular, the shared specification "fail[s] to provide any technical details for the tangible components, but instead predominately describes the system and methods in purely functional terms." *TLI Commc'ns*, 823 F.3d at 612-13 (concluding "the focus of the patentee and of the claims was not on" improved hardware because the specification described the functionality of the hardware "in vague terms without any meaningful limitations"); *Fla. Rsch. Found.*, 916 F.3d at 1368 (asserted claim failed *Alice* step one because neither the patent "nor its claims, explain[ed] *how* the drivers do the [claimed] conversion" and failed "to

provide any technical details for the tangible components…instead predominately describing the system and methods in purely functional terms." (emphasis supplied)).

As in both *TLI Communications* and *University of Florida Research Foundation*, the Patents-at-Issue never recite any specific rules, architecture, or algorithm to implement the computer-implemented method. The Patents-at-Issue instead generically describe the components used without teaching any novel techniques for *how* to send, receive, generate, or transmit the information. For example, the preferred embodiment of the '040 Patent is described as:

> In the preferred embodiment, any of the provider computer(s) 20, the payer computer(s) 30, the patient computer(s) 40, and/or the intermediary computer(s) 50, ***can be any computer or communication device***, including, but not limited to, a personal computer, a home computer, a server computer, a network computer, a hand-held computer, a palmtop computer, a laptop computer, a personal communication device, a personal digital assistant, a telephone, a digital telephone, a television, an interactive television, a beeper, a pager, and/or a watch.

(Appx67, 15:4-14 (emphasis added)). The '048 Patent likewise teaches the claimed inventions can be accomplished using *any* computer or communication device. ((Appx125, 15:65-16:7 (listing the same conventional computers discussed above with respect to the '040 Patent)). The central processing computer "may also be a microprocessor, a minicomputer, a macro-computer, and/or a mainframe computer, depending upon the application." (Appx67, 16:21-23; *see also id.*, Appx69, 20:59-

64; Appx71, 23:22-34; Appx72, 25:9-19; Appx125, 15:65-16:7; Appx126, 17:6-17;

Appx128, 21:49-59; Appx129, 23:35-45, 24:12-27; Appx130, 26:4-14; Appx143,

51:34-49).

As the district court held (Appx13-14), neither of the Patents-at-Issue teach

modifying the conventional devices and instead simply teach using them to carry out

the disclosed steps:

**'048 Patent:**

"At step 1603, the central processing computer 10 will receive and process the user's identification information…" (Appx140, 45:65-66);

"At step 1605, central processing computer 10 will provide the requested information…" (*id.*, 46:14-15);

"At step 1606, the central processing computer 10 will generate a notification report…" (*id.*, 46:44-45);

"At step 1607, the central processing computer 10 will transmit the notification report to the patient or individual…" (*id.*, 46:60-61).

**'040 Patent:**

"At step 1404, the central processing computer 10 will generate a diagnostic report …" (Appx79, 39:63-64);

"At step 1406, the central processing computer 10 will transmit the diagnostic report and/or treatment report…" (*id.*, 40:9-10);

"At step 1507, the central processing computer 10 will transmit a response to the user's diagnosis and prescribed treatment…" (Appx80, 42:12-14);

"At step 1510, the central processing computer 10 will receive and process the user's response provided at step 1509…" (*id.*, 42:28-29).

*See iLife Techs., Inc. v. Nintendo of Am., Inc.,* 839 F. App'x 534, 536 (Fed. Cir. 2021) (nonprecedential) ("Failing to provide any concrete detail for performing the associated functions, however, claim 1 merely amounts to a system capable of sensing information, processing the collected information, and transmitting processed information."); *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1364-65 (Fed. Cir. 2021) (no demonstrated improvement to computer functionality; even assuming the claims recited a feature of computer function, patentee failed to demonstrate the claimed function was something more than a mere use of a computer as a tool).

The Patents-at-Issue's invocation of a "healthcare record" and "insurance claim" does not make the Patents-at-Issue any less abstract but instead merely ties the claim to a field of use. *See Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010) (limiting application of abstract idea to one field of use does not make the concept patentable). Consider that a patient or a healthcare provider could store a healthcare record on a clipboard or in a filing cabinet, transfer the applicable information to a paper insurance form, and put it in the mail. "[I]nformation storage and exchange is an abstract idea even when it uses computers as a tool or is limited to a particular technological environment." *Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520, 526 (Fed. Cir. 2021) (nonprecedential).

Likewise, the fact that Claim 2 of the '040 Patent recites that the insurance claim is "*automatically generated* … in response to the storing of the information regarding the individual" and that "the insurance claim is suitable for being *automatically submitted*," but such automation is insufficient to convey eligibility. (Appx83, 48:15-24 (emphasis added)); *In re Greenstein*, 782 F. App'x 1035, 1038 (Fed. Cir. 2019) (nonprecedential) ("This describes no more than the automation of the longstanding fundamental economic concept of personal financial planning. We have routinely held that such claims are directed to abstract ideas."). Patent claims that merely "'automate pen and paper methodologies' to conserve human resources and minimize errors" are patent-ineligible. *See Fla. Rsch. Found.*, 916 F.3d at 1367; *People.ai*, 2023 WL 2820794, at *8-9. To be patent eligible, a claim directed to automating a previously manual process must recite a specific way to achieve that automation. *People.ai*, 2023 WL 2820794, at *8-9 ("[a]utomation of a manual process may not be an abstract idea if the automated process differs from the manual process and provides 'a specific means or method that improves the relevant technology.'"). The Patents-at-Issue contain no such means or method that improves relevant technology—let alone a discussion about the prevailing automation technology. (*See supra* Sec. II.A.3).

Decapolis claims, without any record support, that the Asserted Claims are "specifically drawn to improving the functionality of health records management

systems by incorporating the specific transmission of ***pertinent data*** to a user communication device." (Br. 14) (emphasis added). Decapolis never identifies *what*, if any, "pertinent data" is transmitted. The Patents-at-Issue instead make broad assertions of undefined data or information transmitted using generic components. For example, exemplary Claim 2 of the '048 Patent describes the transmission of "a message containing at least one of information regarding the person or the entity making the request and identification information regarding the person or the entity making the request…" (Appx145, 55:60-63). Likewise, exemplary Claim 2 of the '040 Patent describes the information in generalities: "information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers, in a database or a memory device, wherein the information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers, includes a healthcare record or a healthcare history of, for, or associated with, each individual of the plurality of individuals…" (Appx83, 47:42-50). Moreover, this supposedly "pertinent" data or information would all normally be found in a patient's paper health record.

### 5.    The claims are analogous to those in ***Joao II*** and ***In re Salwan.***

Claims nearly identical to Claim 2 of the '040 Patent have been found abstract in other proceedings, supporting invalidity. *Enfish*, 822 F.3d at 1334; *Ex Parte Joao*

("*Joao I*"), No. 2016-003277, 2017 WL 2377811, at *3 (P.T.A.B. May 23, 2017)
(nonprecedential); *Ex Parte Joao* ("*Joao II*"), No. 2016-002070, 2017 WL 2303383,
at *4 (P.T.A.B. May 25, 2017) (nonprecedential). For example, in *Joao II*, the PTAB
considered 21 claims with almost exact overlap with Claim 2 and concluded that
"[t]he claims presented here are similar in that regard to those found by the Board,
and affirmed by the Federal Circuit, to be directed to the 'abstract idea of billing
insurance companies and organizing patient health information.'" 2017 WL
2303383, at *4 (citing *In re Salwan*, 681 F. App'x 938, 941 (Fed. Cir. 2017)
(nonprecedential)). The claims in *Joao II* were examined after *Alice* clarified patent
subject matter eligibility. *See id.* Had *Alice* been the law of the land when the '040
Patent was prosecuted, its claims would have been rejected too.

As relied upon by the PTAB in *Joao II*, in *Salwan*, this Court found claims
directed to the abstract idea of billing insurance companies and organizing patient
health information invalid as abstract. *Salwan*, 681 F. App'x at 941. This Court
considered claim elements reciting storing, communicating, transferring, and
reporting patient health information, and using billing software to calculate a
patient's bill, and concluded that "[t]his describes little more than the automation of
a 'method of organizing human activity' with respect to medical information." *Id.*
So too with Claim 2 of the '040 Patent.

Contrary to Decapolis' argument, the district court properly considered both *Joao II* and *Salwan* to inform its conclusion that the Patents-at-Issue are directed to abstract ideas. Moreover, the district court had before it a chart comparing elements of Claim 21 from *Joao II* and Claim 1 of the '040 Patent and showing the direct overlap in language. (Appx341). That chart is found at Appx368-369.

Decapolis suggests that this Court's *Salwan* decision is out-of-date based on the Court's later decision in *TecSec* (Opp. 12-13), but *TecSec* does not discuss *Salwan*. *TecSec*, 978 F.3d at 1292-93. Nor did *TecSec* create any new rules; it relies on the eligibility analysis framework set forth in *Alice*, just like *Salwan* does. Moreover, the claims at issue in both *Salwan* and here are readily distinguishable from those in *TecSec*. (*See supra* Sec. II.A.3).

## B.    Step Two: The Claims Do Not Recite an Inventive Concept.

"After identifying an ineligible concept at step one, we ask at step two "[w]hat else is there in the claims before us?" *BSG Tech*, 899 F.3d at 1290 (citation and quotation omitted). The legal question is whether that "else" adds "significantly more" to the underlying abstract idea. *Alice*, 573 U.S. at 215.

A natural consequence of this inquiry is that "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290. Merely narrowing or reformulating the abstract idea will not

suffice. *Id.* at 1291. Nor will adding "well-understood, routine, conventional activity" or "generic computer implementation" to the claim. *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017); *Alice*, 573 U.S. at 212.

Here, the only idea that the claims add to the manual, abstract method of recording and transmitting patient information is the instruction to "do it on a computer." *Fla. Rsch. Found.*, 916 F.3d at 1367. Accordingly, "[t]his is a quintessential 'do it on a computer' patent: it acknowledges that [patient health] data was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer." *Id.*

### 1.    The record is void of an inventive concept.

The record lacks any allegations or information supporting the Patents-at-Issue disclose an inventive concept under *Alice* step two. Decapolis repeatedly posits that the Claims-at-Issue capture "unconventional technological improvements over the art" (Br. 24-25), but it never explains *what* these supposed improvements were. Nor can it. Rather, as Decapolis admits, the record establishes the Patents-at-Issue were concerned with inaccuracies contained in patient information supplied on paper questionnaires or forms just prior to seeing the healthcare provider (Br. 19-20) and that this paper-based system limited the distribution of the latest information to healthcare providers (Br. 21).

Keeping this recitation of the problem in mind, Decapolis claims that the following allegations in its Counterclaims define the "benefits and technological improvements captured in the Asserted Claims":

> There is no guarantee that the same information will be provided, in a uniform manner, to a next or different provider. As a result, patient information may not be uniformly distributed and/or be available to providers at the point of treatment and/or otherwise.

(Br. 21).

> Another problem which exists in the current healthcare system is that doctors or other providers do not always have the latest information and/or research material available to them prior to, and/or during, the diagnosis and/or treatment process.

(*Id.*; *see also* Br. 23 (citing the Patents-at-Issue's recitation of problem stemming from inaccurate or erroneous patient information leading to deaths)).

These "specific factual allegations in the Counterclaims" simply articulate the purported *problems* from the art (non-technical ones at that) and say nothing of *improvements*, let alone unconventional improvements in technology. (Appx118, 1:38-65; Appx60, 1:38-65). Decapolis faults the district court for "ignor[ing] these well-pled statements" but fails to point to a single improvement or innovative concept. Decapolis likewise argues that the Asserted Claims "solve the technical problem facing the industry in 1999 associated with the lack of accurate and up-to-date clinical data for patients, and the resulting real-world health liabilities resulting therefrom." (Br. 22). However, Decapolis again merely recites the *problem*

44

described in the Patents-at-Issue that arise from pen and paper recordkeeping and omits any description of how the Patents-at-Issue fix that problem other than using generic components to computerize the process. (Br. 23-24); (*see* Sec. II.B.2). As with the Patents-at-Issue, Decapolis falls victim to "merely reciting an abstract idea on a set of generic computer components" without identifying any inventive concepts or improvements. *Hawk Tech.*, 60 F.4th at 1359. Accordingly, the district court properly concluded that Decapolis "[did] not cite to, and I cannot find, any claim language to support its assertion that is claims are directed to 'technological improvements." (Appx13-14).

Decapolis later claims that because the "inventions modify the standard information-gathering paradigm consisting of patient questionnaires," the inventions satisfy the "threshold requirement" of § 101. (Br. 24). This fails for three reasons. *First*, none of the three cases Decapolis cites for this proposition relate in any way to patient questionnaires and only one loosely relates to gathering information. The cases Decapolis cites relate to (i) innovative filtering of content on the Internet (*Bascom Global*), (ii) website improvements that allowed a visitor to be in two places at once (*DDR Holdings*), and (iii) innovative distributed architecture of network devices to reduce data flows for network communications billing (*Amdocs*). *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59

(Fed. Cir. 2014); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301-02 (Fed. Cir. 2016). In those cases, the patents did more than merely adopt generic computer components with no modification or additional teaching. Those patents instead disclosed specific or modified technological components that were implemented in a novel manner to improve existing computerized processes with innovative architecture or workflows. For example, in *Amdocs*, the claims "[did] not merely combine the components in a generic manner, but instead purposefully arrange[d] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks." *Amdocs*, 841 F.3d at 1301. The same cannot be said for the Patents-at-Issue.

*Second*, nothing in the Patents-at-Issue modify or alter anything about the information being gathered. In *Electric Power Group v. Alstrom S.A.*, this Court held claims directed to "collecting information, analyzing it, and displaying certain results of the collection and analysis" were abstract under *Alice* step one. 830 F.3d 1350, 1353 (Fed. Cir. 2016). Under step two, the claims lacked any inventiveness because they "[did] not even require a new source or type of information, or new techniques for analyzing it." *Id.* at 1355. "More particularly, a large portion of the lengthy claims is devoted to enumerating types of information and information sources available within the power-grid environment." *Id.* As the Court held, merely selecting information for collection, analysis, and display, without claiming an

"inventive set of components or methods … that would generate new data" fails to "transform the otherwise-abstract processes of information collection and analysis." *Id.* And the claims did nothing significant to differentiate the process from "ordinary mental processes." *Id.* This Court ultimately held "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." *Id.*

As in *Electric Power Group*, the Patents-at-Issue disclose collecting and using the same patient and insurance information that was always collected, but require doing so using a set of generic components. (*See supra* Sec. II.A.4). For example, both Patents-at-Issue's exemplary Claim 2 describe the "information" being gathered or transmitted in generalities, such as "information regarding the person or the entity making the request and identification information regarding the person or the entity making the request." (Appx145, 55:60-63); (*see also* Appx83, 47:45-60). The specifications disclose the information can include all routine healthcare information. For example, the Patents-at-Issue list the possible information to include as:

> patient name, patient identification information, patient social security number or other identification information, date of birth, doctors or providers, therapists, nutritionists, insurance or payer information, group insurance information, group health insurance information, life insurance information, disability insurance information, patient address, phone number, e-mail and/or other contact information,

> medical history, psychological history, dental history, family history…
> and any other data and/or information regarding the patient which
> would be needed and/or desired…

(Appx67-68, 16:62-17:17; (Appx126, 17:56-18:11) (same).

Likewise, the Patents-at-Issue say nothing about manipulating the data or

improving the data and instead simply teach to store it in a generic database:

> … information regarding a plurality of individuals, a plurality of
> healthcare providers, and a plurality of healthcare insurers or healthcare
> payers, **in a database or a memory device**, wherein the information
> regarding a plurality of individuals…

(Appx83, 47:42-46 (emphasis added));

> The central processing computer 10 also includes a database(s) 10H
> which contains data and/or information pertaining to the patients,
> providers, payers, and intermediaries who or which are serviced by the
> present invention and/or who or which utilize the present invention.

(Appx67, 16:53-57; Appx126, 17:47-51);

> The database 10H can contain any and/or all of the information needed
> and/or required in order to perform any and/or all of the functions,
> services and/or operations described herein as being performed by
> the central processing computer 10 or the apparatus 100 of the present
> invention.

(Appx67, 16:59-62; Appx126, 17:52-56). The fact that the Patents-at-Issue "merely

select[] information, by content or source, for collection, analysis, and display does

nothing significant to differentiate a process from ordinary mental processes, whose

implicit exclusion from § 101 undergirds the information-based category of abstract

ideas." *Elec. Power*, 830 F.3d at 1355.

48

Similarly, the Patents-at-Issue fail to recite any programming and simply require "any computer or communication device" connected to any network to process or store "any and/or all of the information needed and/or required in order to perform any and/or all of the functions, services and/or operations." (Appx67, 16:58-60); *see also* (Appx145, 55:51-59) ("processing, with a processor, … healthcare information or healthcare-related information personal to the individual or patient…"); (Appx126, 17:52-56; Appx83, 47:42-60) ("storing information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers, in a database or a memory device, wherein the information … includes a healthcare record or a healthcare history of, for, or associated with, each individual of the plurality of individuals…").

*Third*, this Court has already held claims directed to collecting patient information using generic computer components are abstract and patent ineligible under § 101. In *University of Florida Research Foundation*, this Court held computer implemented claims directed to automating the collection of "bedside patient information using pen and paper methodologies, such as flowsheets and patient charts" was abstract. 916 F.3d at 1367. Like the Patents-at-Issue, the patent "fail[ed] to provide any technical details for the tangible components, instead predominately describing the system and methods in purely functional terms." *Id.* at 1368. Under *Alice* step two, this Court distinguished *BASCOM* and held the patent

failed to describe any technical improvements over the prior art. *Id.* at 1369. Rather, the patent provided "[t]he present invention ... can be realized in a centralized fashion in one computer system or in a distributed fashion or [a]ny kind of computer system or other apparatus adapted for carrying out the methods described herein." *Id*. (quotations omitted). Thus, "[a]s *BASCOM* recognized, claims like these that 'merely recite the abstract idea ... along with the requirement to perform it on ... a set of generic computer components' do not contain an inventive concept." *Id.* (quoting *BASCOM*, 827 F.3d at 1350).

The Patents-at-Issue contain nearly identical teachings to *University of Florida Research Foundation*: "[i]n the preferred embodiment, any of the provider computer(s) 20, the payer computer(s) 30, the patient computer(s) 40, and/or the intermediary computer(s) 50, can be any computer or communication device" and "[t]he central processing computer(s), the provider computer(s), the payer computers(s), the patient computer(s), and the intermediary computer(s), can communicate with one another, and/or be linked to one another, over a communication network, a telecommunication network, a telephone network, a line-connected network, and/or a wireless communication network." (Appx67, 15:4-14, 15:28-34; Appx125, 15:65-16:7, 16:22-28). In sum, the Patents-at-Issue do little more than adopt generic components to implement the abstract idea. As such, the Patents-at-Issue fail to disclose an inventive concept.

Finally, Decapolis asserts that even accepting the district court's recitation of the abstract idea, "the inventions of the Asserted Claims recite specific applications of the idea such that there are literally zero preemption concerns." (Br. 25). Decapolis neither made this argument below, nor substantively developed it on appeal, and thus it is waived. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295-96 (Fed. Cir. 2009) (arguments either not made or undeveloped at district court are waived); *Game & Tech. Co. v. Wargaming Grp. Ltd.*, 942 F.3d 1343, 1350 (Fed. Cir. 2019) (arguments undeveloped on appeal are waived). Regardless, "the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

### 2.     The Claims rely on nothing more than generic computer components

Under *Alice* step two, the conventionality of the technology is properly considered and the use of generic components cannot transform a claim "into a patent-eligible application of an abstract idea." *BSG Tech*, 899 F.3d at 1290-91; *iLife Techs.*, 839 F. App'x at 537-38; *Elec. Power*, 830 F.3d at 1355.

Citing *iLife Technologies,* Decapolis asserts the fact that the "Asserted Claims recite mere 'conventional components' is entirely irrelevant" to the step two analysis. (Br. 26). However, the portion of *iLife* that Decapolis cites was from this Court's step one analysis, where the Court ultimately held that while a claim is not directed to an abstract concept "simply because it uses conventional technology.

This claim *is, however, directed to an abstract idea* because it contains nothing more than the idea of gathering processing and transmitting data." *iLife Techs.,* 839 F. App'x at 537 (emphasis added).

*iLife* supports finding the Patents-at-Issue are ineligible under § 101. During the step two analysis, this Court held that "[a]side from the abstract idea, the claim recites only generic computer components, including a sensor, a processor, and a communication device. The specification's description of these elements confirms they are generic." *Id.*, at 538.

Thus, contrary to Decapolis' assertion, this Court has and should consider the fact that the Patents-at-Issue only recite generic computer components and the specifications provide no further detail. For example, as shown above, the Patents-at-Issue expressly teach the preferred embodiments any of the computers "can be any computer or communication device." (Appx67, 15:4-14; Appx125, 15:65-16:7).

Similarly, the "unconventional" processor and communication network Decapolis blindly refers to are not specialized. (Br. 26). Instead, the Patents-at-Issue both teach the computers in the preferred embodiment "communicate with one another, and/or be linked to one another, over a communication network, a telecommunication network, a telephone network, a line-connected network, and/or a wireless communication network." (Appx125, 16:22-28; Appx67, 15:28-34). And "the present invention is utilized on, and/or over, the Internet and/or the World Wide

Web." (Appx125, 16:34-35; Appx67, 15:40-41). *Hawk Tech.*, 60 F.4th at 1358-59 (patent failed at *Alice* step two where, *inter alia*, "patent itself confirms that the invention is meant to utilize existing broadband media and other conventional technologies."). No further details or inventive concepts for either the computers or network are recited.

Decapolis argues the claims recite "unconventional approaches over the existing art," but fails to cite any evidentiary support other than a long block quote from the specifications that says a medical doctor will provide updated patient data to the generic processing device, which in turn updates the patient's record. (Br. 23-24). This is not inventive as it merely describes the computerization of a traditionally human process using generic devices. *See Fla. Rsch. Found.*, 916 F.3d at 1368-69 (patent fails step two where it "describe[es] the system[s] and methods in purely functional terms.").

Decapolis further argues that the claimed inventions supposedly solved problems with the use of prior art paper health information forms by having "the central processing computer … update the patient's records in the database…" (Br. 23; Appx530 (citing Appx380, ¶16)). Yet, having a computer perform activities like collecting, storing, and generating information is a textbook example of an abstract idea. *See Fla. Rsch. Found.*, 916 F.3d at 1367-69; *Mortg. Application Techs.*, 839 F. App'x at 526 ("a process that can be and has been performed by humans without the

use of a computer, as the prosecution history shows here, is an abstract idea."); *Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, 703 F. App'x 986, 989-90 (Fed. Cir. 2017) (nonprecedential) (claims that "merely use[ ] a computer and generic components as tools to collect" data and generate reports were abstract).

Decapolis further asserts the claimed inventions "provide an unconventional technological solution by defining a novel processing architecture." (Br. 25). However, as the district court properly concluded, the Patents-at-Issue's claims and specification do not disclose such a solution or processing architecture. (Appx14-15). Decapolis "[s]imply saying that its Patents claim a 'specialized processing device' does not make it so." (Appx15). Moreover, as detailed in *Alice* step one, the Patents-at-Issue simply teach using the conventional devices as is without any modification. (*See supra* Sec. II.A.4).

Nevertheless, "even if the claims achieved this purported solution, they 'only use generic functional language to' do so and require nothing 'other than conventional computer and network components operating according to their ordinary functions' (e.g., a 'personal computer,' 'storage device,' 'external viewing device,' etc.)." *Hawk Tech.*, 60 F.4th at 1358.

### 3.     The Asserted Claims fail the machine-or-transformation test

For the same reasons as above, Decapolis' assertion that the Asserted Claims are saved by the machine-or-transformation test fails. (*See* Br. 27-28). "Merely using

a general-purpose computer and scanner to perform conventional activities in the way they always have, as the claims do here, does not" suffice under the machine-or-transformation test. *Solutran*, 931 F.3d at 1169.

Decapolis argues the district court erred in its application of the machine-or-transformation test because the claims are tied "to a specialized processing device which allows for linking both current and previous providers, and which further allows for the real-time updating of patient information." (*Id.* at 28). The only evidence cited by Decapolis for its assertion is to the following from the '048 Patent:

> At step 710, the medical doctor will transmit the final diagnosis and treatment plan, including the prescribed treatment and/or treatment plan, if any, to the central processing computer 10. At step 711, the central processing computer 10 will then update the patient's records in the database 10H so as to include all of the data and information described as being processed and/or generated by the central processing computer 10, including, but not limited to the patient's symptoms, if any, the examination findings, the information contained in the diagnostic report and the treatment report, the final diagnosis and the prescribed treatment. Thereafter, operation of the apparatus 100 will cease at step 712. The patient's records will then be updated and be available for the patient's next treatment and/or diagnosis.

(Br. 28 (citing Appx132, 29:64-30:10)).

Yet, nothing in this cited text mentions, describes, or defines any "specialized processing device." Rather, all mentions here and elsewhere in the Patents-at-Issue to a "processing device" make clear the claims can be carried out on "any computer." (Appx67, 15:4-14, 16:21-23; Appx69, 20:59-64; Appx71, 23:22-34; Appx72, 25:9-

19; Appx125, 15:65-16:7; Appx126, 17:6-17; Appx128, 21:49-59; Appx129, 23:35-45, 24:12-27; Appx130, 26:4-14; Appx143, 51:34-49).

Nevertheless, even if Decapolis' claims could pass the machine-or-transformation test, they would still be insufficient under step two. "While the Supreme Court has explained that the machine-or-transformation test can provide a 'useful clue' in the second step of *Alice*, passing the test alone is insufficient to overcome [the patentee's] above-described failings under step two." *Solutran*, 931 F.3d at 1169; *DDR Holdings*, 773 F.3d at 1256 ("in *Mayo*, the Supreme Court emphasized that satisfying the machine-or-transformation test, by itself, is not sufficient to render a claim patent-eligible, as not all transformations or machine implementations infuse an otherwise ineligible claim with an 'inventive concept.'"). In other words, "not every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry." *TLI Commc'ns*, 823 F.3d at 611; *Alice*, 573 U.S. at 224 (resolving the § 101 inquiry based on such an argument "would make the determination of patent eligibility 'depend simply on the draftsman's art.'").

## III.    THE DISTRICT COURT PROPERLY DENIED DECAPOLIS' MOTION FOR LEAVE TO FILE AMENDED COUNTERCLAIMS.

Finally, Decapolis argues that the district court abused its discretion by denying Decapolis leave to amend its counterclaims nearly five months after the court's amendment deadline, and nearly four months after Epic filed its Rule 12 motion. The proposed amendment sought to attach an expert report prepared and

56

served in an unrelated litigation against other parties in the W.D. Texas. Decapolis offered no justification, much less good cause, for the delay, and on that basis alone, its motion failed Rule 16. *Sosa*, 133 F.3d at 1418.

Decapolis similarly made no showing under the Rule 15 factors; indeed, *it did not even mention* them. Nor did Decapolis recite any of the "uncontested facts" that it now argues on appeal for the first time. (*Compare* Appx152-154, Appx588-589 with Br. 29). To the extent that Decapolis now argues the merits of the motion, its arguments are waived. *Golden Bridge*, 527 F.3d at 1321-23; *Fresenius*, 582 F.3d at 1295-96.

Even if this Court addresses these new arguments, it should affirm. Decapolis' actions "evidence a lack of diligence" and support "an inference of dilatory motive." (Appx3). Moreover, the motion was futile as the expert report "does not raise any plausible factual disputes[]." (Appx9).

## A.    Decapolis did not meet the standard for leave to amend.

### 1.    Decapolis failed to establish good cause under Rule 16.

Decapolis' *only* justification for its four-month delay was that "an expert now opin[es] on the Section 101 issues of the patents in suit." (Appx2). This reason "alone is insufficient to demonstrate diligence." (*Id.*) Because Decapolis "was not diligent, the [good cause] inquiry should end." *Sosa*, 133 F.3d at 1418. The Eleventh Circuit has affirmed decisions denying motions for leave to amend with less delay.

*McKeever v. Liberty Mut. Grp. Inc.*, 487 F. App'x 487, 488 (11th Cir. 2012) (per curiam) (unpublished) (seven weeks); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1242–43 (11th Cir. 2009) (per curiam) (five months).

Decapolis cannot justify its tardiness; the timing of the Arrigo Report was within its control. *S. Grouts*, 575 F. 3d at 1241 (lack of diligence precluding good cause "can include a plaintiff's failure to seek information it needs to determine whether an amendment is in order"). As the district court noted, Decapolis has been litigating the Patents-at-Issue "since at least April 2021." (Appx2). It was not an abuse of discretion for the district court to hold that Decapolis failed to establish good cause under Rule 16.

### 2. The district court was well within its discretion under Rule 15 to deny Decapolis' motion.

A court properly exercises its "broad discretion" to deny leave to amend where there is, *inter alia*, undue delay, dilatory motive on the part of the movant, or the amendment is futile. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006). The district court duly considered these factors, specifically noting that "[r]ather than raise this issue several months ago, [Decapolis] has waited until now." (Appx3). Decapolis' attempt to amend—after the court entered an order granting Epic's unopposed motion to stay and after the court denied Decapolis' motion to file the Report via a sur-reply—"support[ed] an inference of dilatory motive." (*Id.*).

**B.    The proposed amendment was properly denied as futile.**

**1.    The proposed amendment contains conclusory allegations.**

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Decapolis' proposed amendment merely states that its expert "opined that the claims of the Asserted Patents are not abstract." (Appx583). The Arrigo Report fares no better. For example, Mr. Arrigo concluded that "[e]ach of the Claims is properly directed to the patentable subject matter because none is directed to a patent-ineligible concept, and each of the Claims includes an inventive concept." (Appx221). Courts are "not required to credit such conclusory allegations." *Sanderling*, 65 F.4th at 70. Decapolis further posits—for the first time—that the Report articulates a number of "uncontested facts" regarding the state of the art at the time of the patent. (Br. 29). But such an assertion, even if true, is inconsistent with eligibility under § 101, and Decapolis' ability to rely on it was waived. All of the purported "uncontested facts" are merely recitations of non-technological problems inherent with keeping paper-based healthcare records. As demonstrated above, this is insufficient to confer eligibility. (*See supra* Sec. II.A.2).

**2.    The proposed amendment does not raise any factual disputes.**

The "facts" identified by Decapolis simply describe the state of the art at the time of the alleged inventions, and, at best, describe the alleged novelty of subject

matter of the patents. (Br. 29). While "novel subject matter is necessarily not well-understood, routine, or conventional . . . a patent claim is not eligible under § 101 merely because it recites novel subject matter." *cxLoyalty, Inc. v. Maritz Holdings, Inc.*, 986 F.3d 1367, 1380 (Fed. Cir. 2021).

Decapolis argues that the district court should have accepted the Arrigo Report's factual allegations as true. (Br. 29). But this posture is "nonsense." *Appistry, Inc. v. Amazon.com, Inc*., 195 F. Supp. 3d 1176, 1183 (W.D. Wa. 2016).

> Requiring the Court to accept such facts or legal conclusions (even in the form of an early expert declaration) would permit any plaintiff to circumvent the § 101 inquiry on an early motion to dismiss or motion for judgment on the pleadings simply by including a few lines attesting to the novelty of the invention.

*Id.* at 1183, n.6. And here, the district court did consider the Arrigo Report and determined that "it does not raise any plausible factual disputes after drawing all reasonable inferences in favor of [Decapolis.]" (Appx9). At bottom, Decapolis offers no new factual allegations that would be appropriately considered at the pleadings stage or would impact the § 101 analysis. As this Court has stated, "[n]o amendment to a complaint can alter what a patent itself states." *Sanderling*, 65 F.4th at 706.

Decapolis has not shown that the district court abused its discretion in denying the motion for leave to amend. The district court applied the correct legal standard, followed the correct procedures in determining that Decapolis failed to meet its burden under either Rule 15 or Rule 16, and did not make any erroneous findings of

fact. *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002). Furthermore, the district court correctly determined that the proposed amendment was futile. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999) ("[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.") (quotation marks omitted).

## <u>CONCLUSION</u>

The Court should affirm the district court's judgment.

Dated: May 8, 2023.                    Respectfully submitted,

                                    */s/ Kristin Graham Noel*
                                    Kristin Graham Noel
                                    kristin.noel@quarles.com
                                    Matthew J. Duchemin
                                    matthew.duchemin@quarles.com
                                    Bryce A. Loken
                                    bryce.loken@quarles.com
                                    QUARLES & BRADY LLP
                                    33 East Main St., Suite 900
                                    Madison, Wisconsin 53703
                                    Tel. (608) 251-5000
                                    Fax (608) 251-9166

                                    *Counsel for Plaintiff-Appellee Epic Systems Corporation*

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1302

**Short Case Caption:** Epic Systems Corporation v. Decapolis Systems, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,629  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/08/2023

Signature: /s/ Kristin Graham Noel

Name: Kristin Graham Noel